IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SELLERS CAPITAL, LLC, and SELLERS CAPITAL MASTER FUND, LTD. <br><br> Plaintiffs, <br><br> v. <br><br> GEORGE WIGHT, ARMADA GROUP, GP, INC. and ARMADA ENTERPRISES, INC. <br><br> Defendants. | Case No. 15-cv-07644 <br><br><br><br><br> Hon. Jorge L. Alonso <br><br><br> Mag. Judge Jeffrey T. Gilbert |

**SECOND AMENDED COMPLAINT**

Plaintiffs Sellers Capital, LLC ("Sellers Capital") and Sellers Capital Master Fund, Ltd. ("Sellers Fund") (together, "Plaintiffs"), for their Second Amended Complaint against Defendants George Wight ("Wight"), Armada Group GP, Inc. ("Armada Group"), Armada Enterprises, Inc. ("Armada Enterprises"), allege as follows:

**OVERVIEW**

1. Sellers Capital, LLC, is an Illinois-based investment company that manages the Sellers Fund, an investment fund.

2. Plaintiffs contracted to sell shares of stock in a company called Premier Exhibitions, Inc. ("Premier") to Wight's company, Armada Group, for $16.2 million.

3. To this end, Plaintiffs executed a Stock Purchase Agreement ("Agreement") with Armada Group on October 15, 2014. The Agreement required

Armada Group to pay the $16.2 million purchase price to Plaintiffs no later than November 20, 2014.

4. On November 19, 2014, Wight made clear to Plaintiffs that he was not going to purchase the stock as required by the Agreement. On November 21, 2014, Plaintiffs notified Wight that Armada Group had breached the parties' Agreement by failing to consummate the stock purchase. Wight did not respond, and none of the Defendants ever purchased Plaintiffs' Premier stock.

5. As shown below, Armada Group was a mere instrumentality and alter ego of Armada Enterprises and Wight, and was used by Armada Enterprises and Wight to mislead and work a fraud upon Plaintiffs. Therefore, all three Defendants should be held liable for Armada Group's breach of contract.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332. Sellers Capital is an Illinois limited liability company that has three members, all natural persons. These persons are citizens and permanent residents of Illinois, Colorado, and Michigan, respectively. Sellers Fund is a Cayman Islands corporation with its principal place of business in Illinois. All three Defendants are Florida citizens and permanent residents, and the Defendant corporations' principal places of business are in Florida as well. The amount in controversy exceeds $75,000.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## PARTIES

8. Plaintiff Sellers Capital is an Illinois limited liability company with its principal place of business in Illinois. It has three members, each of whom is a natural person. The three members of Sellers Capital are citizens and permanent residents of Illinois, Colorado, and Michigan, respectively.

9. Plaintiff Sellers Fund is a Cayman Island exempted company, a citizen of the Cayman Islands, and has its principal place of business in Illinois.

10. Defendant Wight is an individual, a citizen and permanent resident of Florida. Wight is an officer, director, and/or agent of numerous corporations and limited liability companies, including the other two defendants in this case.

11. Defendant Armada Group is a Florida corporation, a Florida citizen, and has its principal place of business is in Florida.

12. Defendant Armada Enterprises is a Florida corporation, a Florida citizen, and has its principal place of business in Florida.

## FACTUAL ALLEGATIONS

**Wight Seeks Control of Premier**

13. On March 7, 2014, Wight sent a letter to the Board of Directors of Premier, proposing that Premier combine with Armada Enterprises. Wight attached a three-page proposal to his letter, which he signed as "President, The Armada Enterprises, Inc."

14. Through this letter and in additional communications with Premier throughout the spring of 2014, Wight made clear his interest in either combining

3

Premier with Armada Enterprises or, as an alternative, acquiring a large block of Premier stock as a means for him to control the future of that company.

15. Premier's common stock was publicly traded. At the time Wight made his initial inquiry, Plaintiffs collectively owned approximately 15.43 million shares of Premier's common stock, which represented approximately 31.5% of Premier's issued and outstanding shares, and was a control block of Premier shares.

16. One of Sellers Capital's members, Samuel Weiser ("Weiser"), was, at the time, Premier's CEO.

17. In April 2014, Weiser, on behalf of Premier, took steps to have both Armada Enterprises and Premier valued by professionals, so that Premier and Plaintiffs could better evaluate Wight's offer.

18. On April 28, 2014, Wight sent a "Letter of Intent" to Sellers Capital from another of his companies, Salvor Fund Management, LLC. Wight represented that he was the "Managing Partner/Manager" of Salvor Fund Management, LLC, which had the same business address as Armada Group and Armada Enterprises. In this Letter of Intent, Wight offered to buy Plaintiffs' Premier stock for $1.30/share, for a purchase price of $20,000,000.

19. Plaintiffs took issue with terms contained in Wight's April 28, 2014 Letter of Intent, and never signed or agreed to it.

20. Wight continued to pursue control of Premier. On May 28, 2014, Wight emailed Weiser a draft press release stating that "Armada [G]roup, Inc." was

4

interested in buying Premier's assets or stock. Wight described "Armada [G]roup" as a "private equity sponsored marine salvage preservation and media company."

21. On June 16, 2014, Wight emailed Weiser that his "number one agenda item" was to use "our cash" to find a public company to combine with Armada. Wight sent Weiser this email from his G-mail account, where his signature block identified him as the "Managing Director" of "Salvor Fund Advisors, LLC," and listed www.thearmadacompany.com as one of his websites.

22. In September 2014, Wight sent Weiser more proposals for Armada Enterprises to combine with Premier. One of these proposals sought to combine Premier with Armada Enterprises in a reverse merger that would result in a publicly-traded partnership ("PTP"). Premier declined to accept any of these offers.

**Wight Makes A Deal with Plaintiffs**

23. Having failed to reach agreement with Premier on a corporate combination, Wight decided to buy Plaintiffs' Premier stock.

24. Among other reasons, because Weiser was a Premier insider, Plaintiffs could not sell their shares of Premier stock on the open market and instead chose to do so through a private sale.

25. On October 15, 2014, Plaintiffs agreed to sell their stock to Wight. To that end, they entered into the Agreement with Armada Group. *See* Exhibit A hereto.

5

26. Per the Agreement, Plaintiffs agreed to sell their 15,430,179 shares of Premier common stock to Armada Group at a price of $1.05/share, for an aggregate purchase price ("Purchase Price") of $16,201,688. *See* Ex. A, ¶ 1.1.

27. In the Agreement, Armada Group represented that it "has sufficient cash on hand, to enable [it] to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement." *See* Ex. A, ¶ 4.4

28. Armada Group further represented "that it has conducted to its satisfaction its own independent investigation of [Premier], its business and its assets…" *See* Ex. A, ¶ 4.6.

29. Armada Group also "acknowledge[d] it has made its own decision to consummate the Transaction based on its own independent review and consultations with such investment, legal, tax, accounting and other advisors as it deemed necessary (including a review of the Public Reports)." *Id*.

30. Plaintiffs and Armada Group mutually declared that the Agreement could not be amended, modified, or altered unless done so "in writing and duly executed by the parties hereto." *See* Ex. A., ¶ 7.4. Further, the parties agreed that their Agreement could not be modified by the "course of dealing between or among the parties hereto." *Id*. The Agreement also contained an integration clause in which the parties agreed that the Agreement superseded "any other agreements, whether written or oral, that may have been made or entered into by or among any of the parties hereto." *See* Ex. A., ¶ 7.2.

6

31. The parties agreed that their agreed-to transaction "shall occur" no later than November 20, 2014 (the "Closing Date" or "Closing"), subject to Plaintiffs satisfying two conditions precedent. See Ex. A., ¶ 2.1.

32. First, Plaintiffs had to cause Premier to elect three new directors to its board "effective immediately after the Closing," each to be selected by Wight. See Ex. A, ¶ 2.2(a). Plaintiffs did so, and three individual directors selected by Wight were vetted, selected, and voted to Premier's board, effective immediately after the Closing.

33. Second, Mark Sellers, one of the members of Sellers Capital and a member of Premier's Board of Directors, had to agree to resign from Premier's board "effective on the day following the Closing Date." See Ex. A. ¶ 2.3(b)(i). Mark Sellers agreed to do so, and the Premier board agreed to accept his resignation immediately after the Closing. Mark Sellers has assigned his rights under the Agreement to Sellers Capital, who has assumed all of his obligations under the Agreement except this one. Mark Sellers resigned from Premier's Board of Directors, effective on or about December 18, 2015. From the date of the Agreement through the effective date of his resignation, Mark Sellers remained ready, willing, and able to conditionally resign from Premier's Board of Directors.

34. Plaintiffs also took all steps within their control to have ownership of their shares of Premier stock transferred to Armada Group upon Armada Group's payment of the Purchase Price. These steps constituted the remainder of Plaintiffs' required performance under the Agreement.

35. On November 6, 2014, Weiser emailed Armada Group's counsel and asked counsel to identify the brokerage or other account into which Plaintiffs were to transfer their Premier stock. Weiser also asked on which day Armada Group wished to close.

36. On November 13, 2014, Armada Group's counsel responded by telling Weiser that "[w]e are showing up with the money" and thus he should "stop bugging us." Wight was cc'd on this email.

37. On November 17, 2014, Plaintiffs proposed wire instructions for the Closing that used a third party escrow account to hold both Armada Group's money and Plaintiff's Premier stock, pending satisfaction of all conditions precedent.

38. Wight did not respond, and Armada Group took no steps to arrange the transaction.

39. Despite Plaintiffs having satisfied all conditions precedent to Armada Group's obligation to buy Plaintiffs' Premier stock, and Plaintiffs having fully performed all of their obligations under the Agreement, Armada Group did not tender the Purchase Price or otherwise take steps to close on its obligation to buy Plaintiffs' Premier stock.

**Wight Makes Excuses for Breaching the Agreement**

40. The Parties' latest possible agreed-to Closing Date was November 20, 2014. *See* Ex. A. ¶ 2.1. On November 19, 2014, Wight sent Weiser a letter on Armada Enterprises letterhead in which he tried to add conditions to the

Agreement and otherwise justify Armada Group's non-compliance with and impending breach of the Agreement.

41. Wight wrote that "[o]ur bankers, investors, partners, and investment bankers" have noted a number of "exceptions," *i.e.*, problems with Premier's business, including, for example, that Premier's "management and board seem over paid [*sic*] for this level of performance." Wight also referenced a "merger balance sheet" and declared that "[i]n order for us to close we must have the acceptance of the Armada consolidated balance sheet and terms of combination clearly stated." Wight's letter concluded with him looking forward to "accomplishing [the] collective goals and objectives of Armada."

42. Contrary to Wight's letter, there were no "terms of combination" in the Agreement and there was no requirement that a "merger balance sheet" be created. The Agreement was for a stock share purchase, not a merger.

43. Also in his November 19, 2014 letter, Wight asked for a 45-day extension of the Closing Date and for Premier — a non-party to the Agreement — to make a $2,000,000 escrow payment "until the closing as a break up [*sic*] fee."

44. On the same day, Wight's counsel similarly requested a 45-day extension of the Closing Date. Wight's counsel emailed that "We are committed to giving you $1.05 [per share, the price set in the Agreement], rather than allow our contract with you to expire…" The Agreement was not structured so that Wight could allow it to "expire." His email was written one day before the latest possible Closing Date, all conditions precedent had been satisfied, and Plaintiffs had fully

9

performed all of their obligations under the Agreement. All that was left was for the Defendants to make logistical arrangements to close the deal.

45. Defendants failed to do so. Armada Group did not tender payment to Plaintiffs for their Premier stock by November 20, 2014 (or at any other time), and thus breached the Agreement.

**Damages**

46. In February 2015, Premier undertook a 1-for-10 split of its common stock.

47. Under the Agreement, the Defendants agreed to purchase 15,430,179 shares of Premier common stock at $1.05/share, for a Purchase Price of $16,201,688. That obligation, in current terms, would be a purchase of 1,543,018 shares at $10.50/share, for the same Purchase Price.

48. On or about December 18, 2015, Plaintiffs distributed all of their shares of Premier stock to Plaintiffs' investors and stakeholders at a value of $0.78 per share. This distribution was made by Plaintiffs because, in their business judgment, it was determined to be the best choice for maximizing the value of this asset for Plaintiffs' investors and stakeholders. Plaintiffs' damages are thus $9.72/share, or $14,998,134.

## WIGHT, ARMADA GROUP, AND ARMADA ENTERPRISES ARE ALTER EGOS

49. Wight and Armada Enterprises used Armada Group as a mere instrumentality to mislead and defraud Plaintiffs. In particular, Wight caused Armada Group in the Agreement to represent that it had "sufficient cash on hand,

10

to enable [it] to make payment of the Purchase Price and consummate" the Agreement.

50. This representation misled Plaintiffs, who relied on its veracity in entering into the Agreement.

51. On information and belief, this representation was false and fraudulent, as Armada Group never had sufficient cash on hand or access to cash to buy Plaintiffs' Premier stock.

52. In fact, on information and belief, Armada Group was never capitalized at all. In his communications, Wight made multiple references to he and Armada Enterprises having cash, but never provided evidence to Plaintiffs that they transferred enough cash to Armada Group for it to pay the Purchase Price. Nor did Wight provide any evidence that Armada Group had independent access to cash through a lender, a line of credit, or the like.

53. Armada Group failed to observe corporate formalities. As described above, Wight and Armada Enterprises dealt with Plaintiffs directly. Armada Group existed only as a signatory to the Agreement, and as an instrumentality of Wight and Armada Enterprises.

54. According to the Florida Secretary of State's website, Wight and his business partner Wade Senti formed Armada Enterprises and Armada Group on the same day, January 17, 2014. Senti incorporated both entities, Wight was the president of both, and each had the same business address.

55. Armada Group did not file a 2014 annual report, and has missed the Florida deadline for doing so.

56. On information and belief, Armada Group never issued any stock.

57. Wight's use of Armada Group as a mere instrumentality enabled him to enter into and then intentionally walk away from the Agreement while believing that neither he nor Armada Enterprises would be held liable for Armada Group's non-performance and eventual breach.

**CLAIMS FOR RELIEF**

**COUNT I**
**BREACH OF CONTRACT**
**(All Plaintiffs Against All Defendants)**

58. Plaintiffs reallege and incorporate paragraphs 1 through 57 in this Count.

59. Plaintiffs and Armada Group executed the Agreement on or about October 15, 2014.

60. Plaintiffs and Mark Sellers performed all of their obligations under the Agreement.

61. All conditions precedent to Armada Group's performance occurred and/or were fulfilled.

62. Armada Group breached the Agreement by, among other things, failing to tender the Purchase Price to Plaintiffs for Plaintiffs' Premier stock.

63. As a result of Armada Group's breach of the Agreement, Plaintiffs were damaged in the amount of not less than $14,998,134.

64. Armada Group is the alter ego of, and a mere instrumentality of, Wight and Armada Enterprises.

65. Wight and Armada Enterprises used Armada Group's corporate form to mislead and work a fraud upon Plaintiffs.

66. Armada Group's corporate veil should be pierced, and Wight and Armada Enterprises should each be held jointly and severally liable for Armada Group's breaches of the Agreement.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACT
### (All Plaintiffs Against Wight and Armada Enterprises)

67. Plaintiffs reallege and incorporate paragraphs 1 through 48 and 58 through 66 in this Count.

68. In Count I, Plaintiffs respectfully request that Armada Group's corporate form be disregarded, and its veil pierced to find Wight and Armada Enterprises each liable for Armada Group's breach of contract.

69. This Count II is an alternative if Armada Group's corporate veil is not pierced.

70. To the extent that Wight and Armada Enterprises are considered separate entities from Armada Group, they tortiously interfered with the Agreement.

71. Wight and Armada Enterprises tortiously interfered with the Agreement by, among other actions, failing to fund Armada Group and failing to cause it to close its deal with Plaintiffs.

72. As shown above, the Agreement between Plaintiffs and Armada Group is a valid and enforceable contract.

73. Wight and Armada Enterprises were aware of the Agreement at all relevant times.

74. Wight and Armada Enterprises intentionally and unjustifiably induced Armada Group to breach the Agreement as described herein.

75. Subsequent to Wight and Armada Enterprises' intentional and unjustifiable inducements, Armada Group breached the Agreement. This breach was caused by Wight and Armada Enterprises' wrongful conduct.

76. As a result of Wight and Armada Enterprises' wrongful conduct, Plaintiffs were damaged in the amount of not less than $14,998,134.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following damages against all Defendants jointly and severally: direct and consequential damages, prejudgment interest, costs, and other such relief as is just and proper. Should a judgment be entered on Count II, Plaintiffs in addition request an award of punitive damages.

Respectfully Submitted,

**SELLERS CAPITAL, LLC, AND SELLERS CAPITAL MASTER FUND, LTD.**

Dated: March 29, 2016  By: /s/ Adam N. Hirsch
One of Their Attorneys

Adam N. Hirsch (Ill. No. 6275127)
Andrew E. Cunningham (Ill. No. 6314441)
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100 – Telephone
(312) 663-0303 – Fax
ahirsch@robinsoncurley.com
acunningham@robinsoncurley.com

## **CERTIFICATE OF SERVICE**

I, Andrew E. Cunningham, an attorney, certify that on March 29, 2016, I caused to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, the foregoing **Second Amended Complaint**, using the CM/ECF system, which shall send notice of this filing to all counsel of record.

        /s/ Andrew E. Cunningham
        One of Plaintiffs' Attorneys