IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SELLERS CAPITAL, LLC, and SELLERS CAPITAL MASTER FUND, LTD. | ) ) ) ) ) | Case No. 15-cv-07644 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Hon. Jorge L. Alonso |
| GEORGE WIGHT, ARMADA GROUP, GP, INC. and ARMADA ENTERPRISES, INC. | ) ) ) ) | Mag. Judge Jeffrey T. Gilbert |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT
OF THEIR MOTION TO COMPEL DISCOVERY**

Plaintiffs Sellers Capital, LLC and Sellers Capital Master Fund, Ltd. ("Plaintiffs") have sued Defendants George Wight ("Wight"), Armada Enterprises, Inc. ("AE"), and Armada Group, GP, Inc. ("AG", and collectively, "Defendants") for breach of contract and tortious interference with contract. Plaintiffs also allege that AE and AG are alter egos of Wight, who founded them, controlled them, and manipulated them to perpetrate a fraud on Plaintiffs. Specifically, Wight caused AG to execute a Share Purchase Agreement ("Agreement") with Plaintiffs to buy approximately $16 million in shares of Premier Exhibitions, Inc. ("Premier") stock, caused AG to breach that Agreement by not closing on the deal, and is now hiding behind AG's corporate form in an attempt to escape liability.

In an effort to elicit proof of Wight's abuse of AE and AG's corporate forms, Plaintiffs propounded document requests and interrogatories seeking information

about Wight, AG, and AE's bank records and finances at or near the time of the Agreement. Defendants lodged wholesale objections to this discovery, and maintained many of these objections in their meet-and-confer conversation with Plaintiffs' counsel. Plaintiffs now move to compel.

## FACTUAL BACKGROUND

On October 15, 2014, Plaintiffs and AG executed the Agreement, in which AG agreed to buy from Plaintiffs $16.2 million of Premier's common stock at a price of $1.05 per share. *See* Second Amended Complaint ("SAC"), Dkt. 30 ¶ 26. Prior to the Agreement, Wight told Samuel Weiser ("Weiser"), a member of Sellers Capital, that AE had "$50 million in cash." *See* Ex. 1 to Declaration of Andrew E. Cunningham in Support of Plaintiffs' Motion to Compel Discovery ("Cunningham Decl."). Wight signed the agreement on AG's behalf, and Mark Sellers ("Sellers") signed for Plaintiffs. *See* Dkt. 30-1.

Also prior to the Agreement, in the summer of 2014, Wight sought to borrow $50 million from City National Bank ("CNB"). *See* Ex. 2 to Cunningham Decl. As part of the application process, CNB asked Wight to fill out a Personal Financial Statement and to provide his last three years' tax returns. *See* Ex. 3 to Cunningham Decl. Wight did not respond to this request, and on September 22, 2014, CNB asked again for his tax returns and a personal financial statement. *See* Ex. 4 to Cunningham Decl. Wight instead provided a set of unaudited, home-cooked documents that purported to show AE and AG's finances. *See* Ex. 5 to Cunningham Decl. After reviewing these documents, one CNB representative told another that

2

"[t]here is nothing cohesive in these materials. It is all a bunch of #s that don't make any sense to me without context." *See* Ex. 6 to Cunningham Decl.

On October 15, 2014, without having secured a loan from CNB, Wight executed the Agreement with Plaintiffs. In the Agreement, Wight represented that AG had "sufficient cash on hand, to enable [it] to make payment of the Purchase Price and consummate" the Agreement. *See* Dkt. 30-1 at Sec. 4.4. The Purchase Price was $16.2 million. *See id.* at Sec. 1.1. On the same day Wight made this representation in the Agreement, he asked CNB for a "secured stock loan of $20 million." *See* Ex. 7 to Cunningham Decl.

On November 12, 2014, Wight told CNB that his deal with Plaintiffs was "almost there." *See* Ex. 8 to Cunningham Decl. According to Wight, he was going to be issued stock "at the next board meeting" but Wight "require[d] $20 million to close." *Id*. This was Wight's last contact with CNB prior to the Agreement's closing deadline of November 20, 2014. CNB's records, subpoenaed by Plaintiffs, do not reflect that CNB issued a loan to Wight or any entity Wight controlled in 2014.

As the November 20, 2014 closing date approached, Wight's counsel, Milan Saha, reassured Plaintiffs that "[w]e are showing up with the money." *See* Ex. 9 to Cunningham Decl. He also represented that the Defendants "are committed to giving you $1.05 [per share], rather than allow our contract with you to expire." *See* Ex. 10 to Cunningham Decl.

Despite these assurances, and despite Wight's unambiguous representation in the Agreement that AG had sufficient cash to close, when the November 20, 2014

3

closing date arrived, AG refused to tender payment and instead breached the Agreement.

On August 31, 2015, Plaintiffs filed their initial complaint in this matter, and on March 29, 2016, they filed the SAC. Count I of the SAC alleges that AG breached the Agreement, that Wight, AE, and AG are alter egos, and that AG's corporate veil should be pierced such that Wight and AE should be found liable for AG's breach of the Agreement. *Id*. ¶¶ 49-66. In the alternative, Count II of the SAC alleges that AE and Wight tortiously interfered with the Agreement by causing AG to breach it. *Id*. ¶¶ 67-76.

## **PLAINTIFFS' DISCOVERY REQUESTS**

On December 21, 2015, Plaintiffs served Defendants with document requests ("Requests") and interrogatories ("Interrogatories") (together, "Discovery Requests") seeking among other things, Defendants' financial information, including but not limited to:

- Wight's bank accounts and bank account statements (Wight Interrogatory No. 1; Wight Request No. 21);

- Whether Defendants had any lines of credit (Wight Request No. 23; AE Request No. 21; AG Request No. 21);

- Documents identifying Defendants' assets, cash on hand, and access to cash at the time of the Agreement (Wight Request Nos. 24, 25; AE Request Nos. 22, 23; AG Request Nos. 22, 23);

- Wight's tax returns for 2014 and 2015 (Wight Request No. 26);

- Documents relating to Defendants' efforts to obtain a loan or financing in 2014 or 2015 (Wight Request Nos. 32, 33; AE Request Nos. 38, 39; AG Request Nos. 38, 39);

- Documents relating to the capitalization of AE and AG (AE Request Nos. 26, 27; AG Request Nos. 26, 27); and

- Information regarding asset transfers or reimbursements between or among the Defendants (Wight Request Nos. 29, 31); and any assets Wight inherited from his father (Wight Request No. 30).

*See* Ex. A to Certificate of Compliance with Local Rule 37.2 in Support of Plaintiffs' Motion to Compel Discovery ("L.R. 37.2 Cert.").

Defendants served answers to the Interrogatories on February 16, 2016, and responses to the Requests on February 19 (together "Discovery Responses"). *See* Ex. B to L.R. 37.2 Cert. Wight objected to having to produce any of his financial information. *Id*. AE and AG provided partial answers to some of the Discovery Requests, and objected in full to others. *Id*.

On March 15, 2016, Plaintiffs sent Defendants a letter describing why Plaintiffs considered Defendants' objections to be baseless, and requesting a time to meet-and-confer. *See* Ex. C to L.R. 37.2 Cert. On March 21, counsel held a lengthy meet-and-confer phone call. *See* Ex. D to L.R. 37.2 Cert. Defendants subsequently provided amended discovery responses that only partially addressed Plaintiffs' concerns ("Amended Discovery Responses"). *See* Ex. E to L.R. 37.2 Cert. Specifically, Defendants provided information regarding AE and AG's bank accounts, lines of credit, assets at the time of the Agreement, tax returns, and initial capitalizations, stating that there were none. However, AE and AG maintained objections to a number of Discovery Requests, and answered others only partially.

For his part, Wight dropped some of his objections, but he maintained his refusal to produce any information about any of his bank accounts or finances. *See*

*id*. On April 6, Wight's counsel confirmed that for these Discovery Requests, Wight "stands on his objections." *See* Ex. F to L.R. 37.2 Cert.

Plaintiffs now respectfully request that the Court compel Wight to respond in full to Interrogatory No. 1, and Request Nos. 21, 23, 24, 25, 26, 29, 30, 32 and 33 propounded to him, all of which seek relevant bank records and financial information.[1] For AE and AG, Plaintiffs seek to compel full responses and production of documents in response to Request Nos. 20, 23, 26, 27, 36, 38 and 39 addressed to each of them.

## ARGUMENT

Defendants object that Plaintiffs' Discovery Requests are "not reasonably calculated to lead to the discovery of admissible evidence", "overly broad", "vague and ambiguous", and "improperly seek confidential financial information." None of these objections is explained in any detail, and none has merit.[2]

### I. THE SCOPE OF DISCOVERY UNDER RULE 26 IS BROAD.

Fed. R. Civ. P. 26(b)(1) allows discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the

---

[1] For Wight Request No. 29 regarding asset transfers between Defendants, Wight answers that there were none, but his response improperly limits the scope only to transfers "related to the Agreement." As discussed below, *any* asset transfer between or among the Defendants is relevant to Plaintiffs' alter ego claim.

[2] Defendants' lack of detail or explanation for their objections is an independent reason why their objections should be overruled. *See United Auto. Ins. v. Veluchamy*, No. 09 C 5487, 2010 U.S. Dist. LEXIS 19432, *17-18 (N.D. Ill. Mar. 4, 2010) (discovery respondents have a "burden to show why [the] discovery request is improper," which "cannot be met by a reflexive invocation of the same baseless, often abused litany" of objections).

6

case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Further, "[i]nformation within the scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

Relevance in the discovery context is construed broadly, encompassing "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *White v. Kenneth Warren & Son, Ltd.*, 203 F.R.D. 364, 366 (N.D. Ill. 2001) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). Relevant evidence need only appear reasonably calculated to lead to the discovery of admissible evidence. *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U.A.*, 657 F.2d 890, 903 (7th Cir. 1981). "The party opposing discovery always carries the burden of showing why the requested discovery is improper." *In re Peregrine Fin. Grp. Customer Litig.*, No. 12 C 5546, 2015 U.S. Dist. LEXIS 34829, *10 (N.D. Ill. Mar. 20, 2015).

## II. DEFENDANTS' FINANCIAL INFORMATION IS DISCOVERABLE.

### A. Defendants' Financial Information is Relevant to Plaintiffs' Alter Ego/Veil Piercing Allegations.

Plaintiffs have alleged that AE and AG's corporate veils should be pierced such that Wight should be found liable for AG's breach of the Agreement. AE and AG's veils can be pierced, and Wight held personally liable for AG's breach, if Plaintiffs show that AG was a "mere instrumentality or agent" of Wight, and that

7

Wight used AG "to accomplish some fraud or illegal purpose." *USP Real Estate Inv. Trust v. Discount Auto Parts, Inc.*, 570 So. 2d 386, 391 (Fla. Dist. Ct. App. 1990) (citing *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1117 (Fla. 1984)).[3] Where a corporation "simply had no business purpose other than to act as an insulating entity" for whomever controlled it, that corporation's veil should be pierced and the controlling entity should be held liable. *USP Real Estate Inv. Trust*, 570 So. 2d. at 392 (piercing veil of sham corporation created to sign lease with plaintiff; controlling entity held liable for sham corporation's breach of that lease).

Where veil piercing has been plausibly alleged, courts routinely allow discovery into defendants' bank accounts and financial information. *See Elipas v. Jedynak,* No. 07 C 3026, 2008 U.S. Dist. LEXIS 122898, *13-16 (N.D. Ill. Oct. 3, 2008) (granting motion to compel shareholders' financial information in litigation aiming to hold them personally liable for corporation's actions; such information was "highly relevant" to plaintiffs' alter ego claim); *Fieldturf Int'l, Inc. v. Triexe Mgmt. Grp. Inc.*, No. 03 C 3512, 2004 U.S. Dist. LEXIS 6676, *16 (N.D. Ill. Apr. 14, 2004) (granting motion to compel discovery into defendants' financial records, which were "relevant to several veil piercing factors"); *United States v. Seaga Corp.*, No. 00

---

[3] "The applicable state law to evaluate piercing the corporate veil is the state of incorporation whose veil is sought to be pierced." *Fuller v. Midland Credit Mgmt.*, No. 11 C 5111, 2014 U.S. Dist. LEXIS 28462, *22 (N.D. Ill. Mar. 6, 2014). *See also Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009) (law of state of incorporation applies to veil piercing analysis). AE and AG were incorporated in Florida and Florida law therefore applies to piercing their veils.

C 50389, 2002 U.S. Dist. LEXIS 16996, *5 (N.D. Ill. Sept. 11, 2002) (granting motion to compel production of alleged alter ego's tax returns).[4]

In this case, Defendants' bank accounts and financial information are relevant to show that AE and AG were mere instrumentalities of Wight, and that Wight used AG to perpetrate a fraud on Plaintiffs; namely, Wight's use of AG to execute and then breach the Agreement. Wight established AG as a sham corporation with no assets in an effort to insulate himself from the obligation to buy Plaintiffs' Premier stock for $16.2 million he assumed in the Agreement. When he signed the Agreement, he wanted to have the ability to reap its benefits personally if he so chose, but also the ability to cause AG to breach the Agreement and walk away with no personal consequences.

Wight's representations to Plaintiffs about how much cash he and the other Defendants had were the cornerstones of this scheme. In Section 4.4 of the Agreement, Wight warranted that AG "has sufficient cash on hand, to enable [it] to make payment of the Purchase Price and consummate the transactions[.]" Prior to the Agreement, Wight told Plaintiffs that he had "$50 million in cash." As the Agreement's closing date approached, Wight's lawyer told Plaintiffs that "[w]e are showing up with the money," and Plaintiffs should "stop bugging us." These representations (a) induced Plaintiffs to enter into the Agreement; (b) gave the

---

[4] The *Fieldturf* court rejected defendants' argument against discovery based on a lack of evidence that corporate formalities were ignored; the Court instead held that "[i]t is not surprising the factual record has not been fully developed regarding the relationship among the defendants because the very purpose of discovery is to obtain relevant information." *Fieldturf*, 2004 U.S. Dist. LEXIS 6676 at *13.

impression that Wight entered into the Agreement in good faith; (c) created the illusion that AG was adequately capitalized; and (d) caused Plaintiffs to undertake a substantial effort to satisfy the conditions precedent to closing. By making these representations and then subsequently breaching the Agreement, Wight has put his personal finances at issue.

The limited discovery already provided casts doubt on Wight's truthfulness. It doesn't appear that AG ever issued stock or ever was capitalized; it also doesn't appear that AE was capitalized prior to December 2014, after the Agreement was breached, and in any event AE never had more than nominal funding. Defendants have also admitted that at the time of the Agreement and subsequent breach, AE and AG had no bank accounts, received no wire transfers of cash or other transfers of capital or other assets, and had received no capital contributions or loans from any Defendant or other individuals or entities.

Plaintiffs are entitled to documents shedding light on the true state of Wight, AE and AG's finances at the time of the Agreement and after. There is every indication Wight operated AE and AG as his alter egos and as mere instrumentalities in an intentional effort to perpetrate a fraud against Plaintiffs, and thus that AE and AG's veils should be pierced. *See Dania Jai-Alai Palace, Inc.*, 450 So. 2d at 1117; *USP Real Estate Inv. Trust.*, 570 So. 2d at 391. Put simply: Plaintiffs should be able to discover whether Wight's representations about how much money he (and his companies) had were true.[5]

---

[5] Wight's financial information would be relevant even if his representations end up

The particular documents Plaintiffs seek from Wight, AE, and AG — their bank account records, tax returns, and financial records — are commonly produced in response to veil-piercing discovery. *See Elipas*, 2008 U.S. Dist. LEXIS 122898 at *13-16 (compelling discovery of shareholders' financial information, which included bank account statements, loan applications, personal financial statements, appraisals, and tax materials, as well as documents showing the relationship between the shareholders and their various entities); *Fieldturf*, 2004 U.S. Dist. LEXIS 6676 at *5-7, 11-13 (compelling discovery of information relating to alleged alter ego's assets and liabilities, tax filings, bank accounts, and any transfers or exchanges of money or assets between them); *Seaga Corp.*, 2002 U.S. Dist. LEXIS 16996 at *5 (compelling production of alleged alter ego's tax returns). Defendants' objections to the production of their bank records, tax returns, and financial information should be overruled. [6]

---

being truthful. If he did have millions of dollars of cash, his failure to transfer money to AG to close on the Agreement would support Plaintiffs' alternative claim that he tortiously interfered with the Agreement.

[6] Separately and in addition, Defendants' current financial information is relevant to Plaintiffs' claim for punitive damages. *See Fieldturf*, 2004 U.S. Dist. LEXIS 6676 at *6-7 ("When punitive damages are sought, a party's financial condition is at issue and discovery on that subject is relevant.").

11

### B. Plaintiffs' Discovery Requests are not vague or ambiguous.

Defendants object to a number of phrases in the Discovery Requests as being vague and ambiguous, but do not explain why. This lack of explanation is fatal. *See Thermapure Inc. v. Giertsen Co. of Ill., Inc.*, No. 10 C 4724, 2013 U.S. Dist. LEXIS 41086, *11 (N.D. Ill. Mar. 25, 2013) (overruling vagueness objection because objector "provides no explanation for how they [the discovery requests] are vague"). The ambiguity objections also fail because Defendants do not identify any reasonable alternative meanings for the phrases they contest. *See Advance Cable Co., LLC v. Cincinnati Ins. Co., LLC*, 788 F.3d 743, 746 (7th Cir. 2015) (language is ambiguous only where it is "susceptible to more than one reasonable interpretation") (quotations and citations omitted).

In any event, the phrases to which Defendants object are "ordinary words that do not require definition" and therefore Defendants' objections are not well-taken. *Thermapure*, 2013 U.S. Dist. LEXIS 41086 at *10. *See also Pulsecard, Inc. v. Discover Card Servs.*, 168 F.R.D 295, 310 (D. Kan. 1996) ("Respondents should exercise reason and common sense to attribute ordinary definitions to terms and phrases utilized in interrogatories."). Defendants object to the following terms as being vague or ambiguous:

- *"Access to Cash."* (AE Request No. 23; AG Request No. 23). These Requests ask for documents relating to AE or AG's "cash on hand or access to cash" during the relevant time period.[7] "Access to cash" is not vague, as it plainly refers to AE or AG's ability to obtain cash that might have been used to close

---

[7] These Requests are limited to "September 1, 2015 through December 31, 2015." The year is an obvious typo, and should be "2014," as that was the year in which the Agreement was executed.

12

   the Agreement, even if that cash was not in the company's immediate possession.

- *"Infusion of Capital."* (AE Request No. 27; AG Request No. 27). These Requests ask for documents relating to any "infusion of capital" into AE or AG "other than your initial capitalization." This context makes the phrase's meaning plain: an infusion of capital is any receipt of capital by AE or AG after their initial capitalizations.

- *"Request" and "in an effort."* (AE Request Nos. 38 and 39; AG Request Nos. 38 and 39). These Requests ask for documents relating to AE and AG's efforts "to obtain a loan or financing." In this context, the word "request" is not vague, as it would encompass communications with a lender aimed at obtaining a loan. The phrase "in an effort" is similarly clear. Wight's emails with CNB (obtained from CNB but not from Wight), are examples of documents responsive to this Request that Defendants have objected to producing.

*See* Ex. E to L.R. 37.2 Cert.

In their Amended Discovery Responses, Defendants also object that a number of the Discovery Requests are overbroad as to "time." *Id.* But the Discovery Requests are, unless otherwise indicated, expressly limited to the time period of January 1, 2014 to the present. *See* Ex. A to L.R. 37.2 Cert. These limits are reasonable and therefore not objectionable. *See Biedrzycki v. Town of Cicero*, No. 04 C 3277, 2005 U.S. Dist. LEXIS 16423, *38 (N.D. Ill. Aug. 8, 2005) (rejecting overbreadth objection where party offered reasonable time limits). In the parties' meet-and-confer — held before Defendants served their Amended Discovery Responses — Plaintiffs offered to discuss additional reasonable time limitations, but the Defendants instead elected to maintain their overbreadth objections. These objections should be overruled.

## C. Defendants' confidentiality objection is baseless.

Defendants' other basis for objection, that the Discovery Requests "improperly seek[] confidential financial information," *see, e.g.*, Wight Amended Discovery Response Nos. 21, 23, 24, 25, 26, 32 and 33 (Ex. E to L.R. 37.2 Cert.), is meritless. "[I]t is well settled that confidentiality does not act as a bar to discovery and is generally not grounds to withhold documents from discovery." *High Point Sarl v. Sprint Nextel Corp.*, No. 09-2269-CM-DJW, 2011 U.S. Dist. LEXIS 83126, *9 (D. Kan. July 29, 2011). In any event, the Court has entered an Agreed Confidentiality Order in this case, the protections of which are available for Defendants' bank accounts, tax returns, and financial information. Dkt. 29.

## IV. RULE 37 MANDATES AN AWARD OF ATTORNEYS' FEES.

Under Federal Rule of Civil Procedure 37(a)(5), "[i]f the motion [to compel] is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A); *Lorillard Tobacco Co. v. Elston Self Serv. Wholesale Groceries*, 259 F.R.D. 323, 326 (N.D. Ill. 2009). The burden then shifts to the non-moving party to show that one of the exceptions to payment under Rule 37(a)(5)(A) applies; if not, the movant is entitled to an "automatic award of fees". *Lorillard*, 259 F.R.D. at 327.

14

If their motion is granted, Plaintiffs respectfully request that the Court award them their fees incurred in bringing it. Plaintiffs filed this motion after attempting in good faith to obtain discovery without court action; Defendants' objections and nondisclosures are not substantially justified; and there are no other circumstances making an award of expenses unjust. Fed. R. Civ. P. 37(a)(5)(A)(i-iii).

## CONCLUSION

WHEREFORE, Plaintiffs Sellers Capital, LLC and Sellers Capital Master Fund, Ltd. respectfully request that this Court grant their Motion to Compel Disocvery, and award Plaintiffs their reasonable fees incurred in bringing this motion.

Respectfully Submitted,

**SELLERS CAPITAL, LLC, AND SELLERS CAPITAL MASTER FUND, LTD.**

Dated: April 12, 2016  By:  /s/ Adam N. Hirsch
One of Their Attorneys

Adam N. Hirsch (Ill. No. 6275127)
Andrew E. Cunningham (Ill. No. 6314441)
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100 – Telephone
(312) 663-0303 – Fax
ahirsch@robinsoncurley.com
acunningham@robinsoncurley.com

## **CERTIFICATE OF SERVICE**

I, Andrew E. Cunningham, an attorney, certify that on April 12, 2016, I caused to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, the foregoing, using the CM/ECF system, which shall send notice of this filing to all counsel of record.

    /s/ Andrew E. Cunningham
One of Plaintiffs' Attorneys