IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SELLERS CAPITAL, LLC, et al. ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> ARMADA GROUP, GP, INC., et al, ) <br> ) <br> Defendants. ) <br> ) | Case No. 15 CV 07644 |

**DEFENDANT ARMADA GROUP, GP, INC.'S, ARMADA ENTERPRISES, INC.'S, AND GEORGE WIGHT'S ANSWER TO SECOND AMENDED COMPLAINT**

NOW COMES ARMADA GROUP, GP, INC., ARMADA ENTERPRISES, INC., AND GEORGE WIGHT, by and through their attorneys, The Agrawal Firm, LLC, and Answers Plaintiffs' Second Amended Complaint as follows:

**OVERVIEW**

1. Sellers Capital, LLC is an Illinois based-investment company that manages the Sellers Fund, an investment fund.

**Answer:** Admitted.

2. Plaintiffs contracted to sell shares of stock in a company called Premier Exhibitions, Inc. ("Premier") to Wight's company, Armada Group, for $16.2 million.

**Answer:** Defendants deny that the allegations contained in this paragraph properly represent the complete set of terms of any agreement between the parties.

3. To this end, Plaintiffs executed a Stock Purchase Agreement ("Agreement") with Armada Group on October 15, 2014. The Agreement required Armada Group to pay the $16.2 million

1

purchase price to Plaintiffs no later than November 20, 2014.

**Answer:** Defendants admit that there was an originally agreed purchase price of $16.2 million dollars but deny that the allegations in this paragraph properly represent the complete set of terms of any agreement between the parties. Defendant further answers that the Agreement speaks for itself.

4. On November 19, 2014, Wight made clear to Plaintiffs that he was not going to purchase the stock as required by the Agreement. On November 21, 2014, Plaintiffs notified Wight that Armada Group had breached the parties' Agreement by failing to consummate the stock purchase. Wight did not respond, and none of the Defendants ever purchased Plaintiffs' Premier stock.

**Answer:** Defendants admit that on, or about, November 21, 2014, Plaintiffs notified Defendant Wight that Defendant Armada Group had allegedly breached the Agreement and further admit Defendant Armada Group has not purchased Plaintiffs' Premier stock to date. Defendant denies the remaining allegations contained in this paragraph.

5. As shown below, Armada Group was a mere instrumentality and alter ego of Armada Enterprises and Wight, and was used by Armada Enterprises and Wight to mislead and work a fraud upon Plaintiffs. Therefore, all three Defendants should be held liable for Armada Group's breach of contract.

**Answer:** Denied.

6. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 USC 1332. Sellers Capital is an Illinois limited liability company that has three members, all natural persons. These persons are citizens and permanent residents of Illinois, Colorado, and Michigan respectively. Sellers Fund is a Cayman Island corporation with its principal place of business in

Illinois. All three Defendants are Florida citizens and permanent residents, and the Defendant corporations' principal places of business are in Florida as well. The amount in controversy exceeds $75,000.

**Answer:** The allegations contained in this paragraph amount to legal conclusions to which no answer is required.

7. Venue is proper in this district pursuant to 28 USC 1391.

**Answer:** The allegations contained in this paragraph amount to legal conclusions to which no answer is required.

### PARTIES

8. Plaintiff Sellers Capital is an Illinois limited liability company with its principal place of business in Illinois. It has three members, each of whom is a natural person. The three members of Sellers Capital are citizens and permanent residents of Illinois, Colorado, and Michigan, respectively.

**Answer:** Admitted.

9. Plaintiff Sellers Fund is a Cayman Island exempted company, a citizen of the Cayman Islands, and has its principal place of business in Illinois.

**Answer:** Admitted.

10. Defendant Wight is an individual, a citizen and permanent resident of Florida. Wight is an officer, director, and/or agent of numerous corporations and limited liability companies, including the other two defendants in this case.

**Answer:** Defendant Wight admits that he is an officer, director, and/or agent of certain companies including the co-defendants in this matter. Defendant Wight admits the remaining allegations contained in this paragraph.

11. Defendant Armada Group is a Florida corporation, a Florida citizen, and has its principal place of business in Florida.

**Answer:** Admitted.

12. Defendant Armada Enterprises is a Florida corporation, a Florida citizen, and has its principal place of business in Florida.

**Answer:** Admitted.

## FACTUAL ALLEGATIONS

13. On March 7, 2014, Wight sent a letter to the Board of Directors of Premier, proposing that Premier combine with Armada Enterprises. Wight attached a three-page proposal to his letter, which he signed as "President, The Armada Enterprises, Inc."

**Answer:** Defendants answer that the document speaks for itself.

14. Through this letter and in additional communications with Premier throughout the spring of 2014, Wight made clear his interest in either combining Premier with Armada Enterprises or, as an alternative, acquiring a large block of Premier stock as a means for him to control the future of that company.

**Answer:** Defendants are unable to answer as the phrase "made clear" is vague and ambiguous.

15. Premier's common stock was publicly traded. At the time Wight made his initial inquiry, Plaintiffs collectively owned approximately 15.43 million shares of Premier's common stock, which represented approximately 31.5% of Premier's issued and outstanding shares, and was a control block of Premier shares.

**Answer:** Admitted.

16. One of Sellers Capital's members, Samuel Weiser ("Weiser"), was, at the time, Premier's CEO.

**Answer:** Admitted.

17. In April 2014, Weiser, on behalf of Premier, took steps to have both Armada Enterprises and Premier valued by professionals, so that Premier and Plaintiffs could better evaluate Wight's offer.

**Answer:** Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.

18. On April 28, 2014, Wight sent a "letter of intent" to Sellers Capital from another of his companies, Salvor Fund Management, LLC. Wight represented that he was the "Managing Partner/Manager" of Salvor Fund Management, LLC, which had the same business address as Armada Group and Armada Enterprises. In this letter of intent, Wight offered to buy Plaintiffs' Premier Stock for $1.30/share, for a purchase price of $20,000,000.

**Answer:** Defendants answer that the Letter of Intent speaks for itself.

19. Plaintiffs took issue with terms contained in Wight's April 28, 2014 Letter of Intent, and never signed or agreed to it.

**Answer:** Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.

20. Wight continued to pursue control of Premier. On May 28, 2014, Wight emailed Weiser a draft press release stating that "Armada Group, Inc." was interested in buying Premier's assets or stock. Wight described "Armada Group" as a "private equity sponsored marine salvage preservation and media company."

**Answer:** Defendants admit that they maintained an interest to purchase shares of Premier. Defendants further answer that the press release speaks for itself.

21. On June 16, 2014, Wight emailed Weiser that his "number one agenda item" was to use

"our cash" to find a public company to combine with Armada. Wight sent Weiser this email from his gmail account, where his signature block identified him as the "managing director" of "Salvor Fund Advisors, LLC," and listed www.thearmadacompany.com as one of the websites.

**Answer:** Defendants answer that the June 16, 2014 email speaks for itself.

22. In September 2014, Wight sent Weiser more proposals for Armada Enterprises to combine with Premier. One of these proposals sought to combine Premier with Armada Enterprises in a reverse merger that would result in a publicly-traded partnership ("PTP"). Premier declined to accept any of these offers.

**Answer:** Defendants answer that the proposals speak for themselves. Defendants lack sufficient knowledge to admit or deny the remaining allegations contained in this paragraph.

23. Having failed to reach agreement with Premier on a corporate combination, Wight decided to buy Plaintiff's Premier stock.

**Answer:** Defendant makes no answer to the allegations contained in this paragraph as the term "decided to" is vague and ambiguous.

24. Among other reasons, because Weiser was a Premier insider, Plaintiffs could not sell their shares of Premier stock on the open market and instead chose to do so through a private sale.

**Answer:** Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.

25. On October 15, 2014, Plaintiffs agreed to sell their stock to Wight. To that end, they entered into the Agreement with Armada Group. See Exhibit A hereto.

**Answer:** Defendants answer that the Agreement speaks for itself. Defendants further deny that there was ever an agreement to sell their stock to Defendant Wight.

26. Per the Agreement, Plaintiffs agreed to sell their 15,430,179 shares of Premier common stock to Armada Group at a price of $1.05/share, for an aggregate purchase price ("Purchase Price") of $16,201,688. See Ex. A, Paragraph 1.1.

**Answer:** Admitted. Defendants answer further that the Agreement speaks for itself as to the full set of terms of the Agreement.

27. In the Agreement, Armada Group represented that it "has sufficient cash on hand, to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement." See Ex. A, Paragraph 4.4.

**Answer:** Defendants answer that the document speaks for itself.

28. Armada Group further represented "that it has conducted to its satisfaction its own independent investigation of Premier, its business and its assets. . ." See Ex. A, Par. 4.6.

**Answer:** Defendants answer that the document speaks for itself.

29. Armada Group also "acknowledged it has made its own decision to consummate the Transaction based on its own independent review and consultations with such investment, legal, tax, accounting and other advisors as it deemed necessary (including a review of the Public reports)." Id.

**Answer:** Defendants answer that the document speaks for itself.

30. Plaintiffs and Armada Group mutually declared that the Agreement could not be amended, modified, or altered unless done so "in writing and duly executed by the parties hereto." See Ex. A., Par. 7.4. Further, the parties agreed that their Agreement could not be modified by the "course of dealing between or among the parties hereto." Id. The Agreement also contained an integration clause in which the parties agreed that the Agreement superseded "any other agreements, whether written or oral, that may have been made or entered into by or

among any of the parties hereto." See Ex.A., Par. 7.2.

**Answer:** Defendants makes no answer as "mutually declared" is a legal conclusion to which no answer is required. As to the remaining allegations in the paragraph, Defendants answer that the document speaks for itself.

31. The parties agreed that their agreed-to transaction "shall occur" no later than November 20, 2014 (the "Closing Date" or "Closing"), subject to Plaintiffs satisfying two conditions precedent. See Ex.A., Par. 2.1.

**Answer:** Defendants make no answer as the allegations in this paragraph amount to a legal conclusion to which no answer is required. Defendants further answers that the document speaks for itself.

32. First, Plaintiffs had to cause Premier to elect three new directors to its board 'effective immediately after the Closing," each to be selected by Wight. See Ex. A, Par. 2.2(a). Plaintiffs did so, and three individual directors selected by Wight were vetted, selected, and voted to Premier's board, effective immediately after the Closing.

**Answer:** Denied.

33. Second, Mark Sellers, one of the members of Sellers Capital and a member of Premier's Board of Directors, had to agree to resign from Premier's board "effective on the day following the Closing Date." See Ex. A, Par. 2.3(b)(i). Mark Sellers agreed to do so, and the Premier board agreed to accept his resignation immediately after the Closing. Mark Sellers has assigned his rights under the Agreement to Sellers Capital, who has assumed all of his obligations under the Agreement except this one. Mark Sellers resigned from Premier's Board of Directors, effective on or about December 18, 2015. From the date of the agreement, through the effective date of his resignation, Mark Sellers remained ready, willing, and able to conditionally resign

from Premier's Board of Directors.

**Answer:** Defendants answer that the Agreement speaks for itself with regards to the terms. Defendants lack sufficient information to admit or deny the remaining allegations contained in the paragraph.

34.     Plaintiffs also took all steps within their control to have ownership of their shares of Premier stock transferred to Armada Group upon Armada Group's payment of the purchase price. These steps constituted the remainder of Plaintiffs' required performance under the Agreement.

**Answer:** Defendants answer that the Agreement speaks for itself with regards to the terms. Defendants lack sufficient information to admit or deny the remaining allegations contained in the paragraph.

35.     On November 6, 2014, Weiser emailed Armada Group's counsel and asked counsel to identify the brokerage or other account into which Plaintiffs were to transfer their Premier stock. Weiser also asked on which day Armada Group wished to close.

**Answer:** Defendants answer that the November 6, 2014 email speaks for itself.

36.     On November 13, 2014, Armada Group's counsel responded by telling Weiser that "we are showing up with the money" and thus he should "stop bugging us," Wight was cc'd on this email.

**Answer:** Defendants answer that the November 13, 2014 email speaks for itself.

37.     On November 17, 2014, Plaintiffs proposed wire instructions for the Closing that used a third party escrow account to hold both Armada Group's money and Plaintiff's Premier Stock, pending satisfaction of all conditions precedent.

**Answer:** Admitted.

38. Wight did not respond, and Armada Group took no steps to arrange the transaction.

**Answer:** Defendants deny that there was any transaction at that time to arrange.

39. Despite Plaintiffs having satisfied all conditions precedent to Armada Group's obligation to buy Plaintiff's Premier Stock, and Plaintiffs having fully performed all of their obligations under the Agreement, Armada Group did not tender the Purchase Price or otherwise take steps to close on its obligation to buy Plaintiffs' Premier Stock.

**Answer:** Defendants deny that Plaintiffs satisfied all conditions precedent. Defendants admit that Defendant Armada Group has not tendered payment but denies that it was required to do so.

40. The Parties' latest possible agreed to closing date was November 20, 2014. See Ex. A, Par. 2.1. On November 19, 2014, Wight sent Weiser a letter on Armada Enterprises letterhead in which he tried to add conditions to the Agreement and otherwise justify Armada Group's non-compliance with and impending breach of the Agreement.

**Answer:** Defendants answer that the Agreement and the November 19, 2014 letter speak for themselves.

41. Wight wrote that "our bankers, investors, partner, and investment bankers" have noted a number of "exceptions," i.e. problems with Premier's business, including, for example, that Premier's "management and board seem over paid for this level of performance." Wight also referenced a "merger balance sheet" and declared that "in order for us to close we must have the acceptance of the Armada consolidated balance sheet and terms of combination clearly stated." Wight's letter concluded with him looking forward to "accomplishing the collective goals and objectives of Armada."

**Answer:** Defendants answer that the document speaks for itself.

42. Contrary to Wight's letter, there were no "terms of combination" in the Agreement and

there was no requirement that a "merger balance sheet" be created. The Agreement was for a stock share purchase, not a merger.

**Answer:** The allegations contained in this paragraph amount to legal conclusions and argument and do not require an answer.

43. Also in his November 19, 2014 letter, Wight asked for a 45 day extension of the closing date and for Premier – a non-party to the Agreement – to make a $2,000,000 escrow payment "until the closing as a break up fee".

**Answer:** Defendants answer that the document speaks for itself.

44. On the same day, Wight's counsel similarly requested a 45 day extension of the closing date. Wight's counsel emailed that "We are committed to giving you $1.05 (per share, the price set in the Agreement), rather than allow our contract with you to expire . . ." The Agreement was not structured so that Wight could allow it to "expire". His email was written one day before the latest possible closing date, all conditions precedent had been satisfied, and Plaintiffs had fully performed all of their obligations under the Agreement. All that was left was for the Defendants to make logistical arrangements to close the deal.

**Answer:** Defendants answer that any referenced communications speak for themselves. Defendants make no answer to the remaining allegations contained in this paragraph as they amount to legal conclusions and argument to which no answer is required.

45. Defendants failed to do so. Armada Group did not tender payment to Plaintiffs for their Premier stock by November 20, 2014 (or at any other time), and thus breached the agreement.

**Answer:** Defendants admit that payment was not tendered at any time but deny that any payment was due. Defendants deny the remaining allegations contained in this paragraph.

46. In February, 2015, Premier undertook a 1 for 10 split of its common stock.

**Answer:** Admitted.

47. Under the Agreement, the Defendants agreed to purchase 15,430,179 shares of Premier common stock at $1.05/share, for a Purchase Price of $16,201,688. That obligation, in current terms, would be a purchase of 1,543,018 shares at $10.50/share, for the same Purchase Price.

**Answer:** Defendants admit the proposed terms pursuant to the agreement. Defendants lack sufficient information to admit or deny the allegations concerning the terms under the alleged current value.

48. On or about December 18, 2015, Plaintiffs distributed all of their shares of Premier stock to Plantiffs' investors and stakeholders at a value of $.78 per share. This distribution was made by Plaintiffs, because, in their business judgment, it was determined to be the best choice for maximizing the value of this asset for Plaintiffs' investors and stakeholders. Plaintiffs' damages are thus $9.72 share or $14,998,134.

**Answer:** Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.

49. Wight and Armada Enterprises used Armada Group as a mere instrumentality to mislead and defraud Plaintiffs. In particular, Wight caused Armada Group in the Agreement to represent that it had "sufficient cash on hand, to enable it to make payment of the Purchase Price and consummate" the Agreement.

**Answer:** Denied.

50. This representation misled Plaintiffs, who relied on its veracity in entering into the Agreement.

**Answer:** Denied.

51. On information and belief, this representation was false and fraudulent, as Armada Group

never had sufficient cash on hand or access to cash to buy Plaintiffs' Premier stock.

**Answer:** Denied.

52. In fact, on information and belief, Armada Group was never capitalized at all. In his communications, Wight made multiple references to he and Armada Enterprises having cash, but never provided evidence to Plaintiffs that they transferred enough cash to Armada Group for it to pay the purchase price. Nor did Wight provide any evidence that Armada Group had independent access to cash through a lender, a line of credit, or the like.

**Answer:** Denied.

53. Armada Group failed to observe corporate formalities. As described above, Wight and Armada Enterprises dealt with Plaintiffs directly. Armada Group existed only as a signatory to the Agreement, and as an instrumentality of Wight and Armada Enterprises.

**Answer:** Denied.

54. According to the Florida Secretary of State's website, Wight and his business partner Wade Senti formed Armada Enterprises and Armada Group the same day, January 17, 2014. Senti incorporated both entities, Wight was the president of both, and each had the same business address.

**Answer:** Admitted.

55. Armada Group did not file a 2014 annual report, and has missed the Florida deadline for doing so.

**Answer:** Admitted.

56. On information and belief, Armada Group never issued any stock.

**Answer:** Admitted.

57. Wight's use of Armada Group as a mere instrumentality enabled him to enter into and

13

then intentionally walk away from the Agreement while believing that neither he nor Armada Enterprises would be held liable for Armada Group's non-performance and eventual breach.

**Answer**: Denied.

## COUNT I

58. Plaintiffs reallege and incorporate paragraphs 1 through 57 in this Count.

**Answer:** Defendants re-allege and incorporate their answers to Paragraphs 1 through 57 as though fully set forth herein.

59. Plaintiffs and Armada Group executed the Agreement on or about October 15, 2014.

**Answer:** Admitted.

60. Plaintiffs and Mark Sellers performed all of their obligations under the Agreement.

**Answer:** Denied.

61. All conditions precedent to Armada Group's performance occurred and/or were fulfilled.

**Answer:** Denied.

62. Armada Group breached the Agreement by, among other things, failing to tender the Purchase Price to Plaintiffs for Plaintiffs' Premier Stock.

**Answer:** Defendants admit that payment was not tendered but deny that Defendant Armada Group was required to do so. Defendants deny the remaining allegations contained in this paragraph.

63. As a result of Armada Group's breach of the Agreement, Plaintiffs were damaged in the amount of not less than $14,998,134.

**Answer:** Denied.

64. Armada Group is the alter ego of, and a mere instrumentality of, Wight and Armada Enterprises.

**Answer:** Denied.

65. Wight and Armada Enterprises used Armada Group's corporate form to mislead and work a fraud upon Plaintiffs.

**Answer:** Denied.

66. Armada Group's corporate veil should be pierced, and Wight and Armada Enterprises should each be held jointly and severally liable for Armada Group's breaches of the Agreement.

**Answer:** Denied.

**WHEREFORE**, Defendants respectfully request this court to enter judgment in favor of Defendants and for any other relief the court deems appropriate.

## COUNT II

### (As to Armada Enterprises and George Wight only)

67. Plaintiffs reallege and incorporate paragraphs 1 through 48 and 58 through 66 in this Count.

**Answer:** Defendants re-allege and incorporate their answers to Paragraphs 1 through 48 and 58 through 66 as though fully set forth herein.

68. In Count I, Plaintiffs respectfully request that Armada Group's corporate form be disregarded, and its veil pierced to find Wight and Armada Enterprises each liable for Armada Group's breach of contract.

**Answer:** Defendants deny that Armada Group's corporate form should be disregarded and further deny that its veil should be pierced and that George Wight or Armada Enterprises are liable in any way for Armada Group's alleged breach of contract.

69. This Count II is an alternative if Armada Group's corporate veil is not pierced.

**Answer:** This paragraph does not contain any factual allegations and therefore no answer is required.

70. To the extent that Wight and Armada Enterprises are considered separate entities from Armada Group, they tortuously interfered with the Agreement.

**Answer:** Denied.

71. Wight and Armada Enterprises tortuously interfered with the Agreement by, among other actions, failing to fund Armada Group and failing to cause it to close its deal with Plaintiffs.

**Answer:** Denied.

72. As shown above, the Agreement between Plaintiffs and Armada Group is a valid and enforceable contract.

**Answer:** Defendants make no answer as the allegations in this paragraph amount to legal conclusions to which no answer is required.

73. Wight and Armada Enterprises were aware of the Agreement at all relevant times.

**Answer:** Defendants admits the allegations contained in this paragraph.

74. Wight and Armada Enterprises intentionally and unjustifiably induced Armada Group to breach the Agreement as described herein.

**Answer:** Denied.

75. Subsequent to Wight and Armada Enterprises' intentional and unjustifiable inducements, Armada Group breached the Agreement. This breach was caused by Wight and Armada Enterprises' wrongful conduct.

**Answer:** Denied.

76. As a result of Wight and Armada Enterprises' wrongful conduct, Plaintiffs were damaged

in the amount of not less than $14,998,134.

**Answer:** Denied.

    **WHEREFORE**, Defendants Armada Enterprises and George Wight respectfully request this court to enter judgment in favor of Defendants and for any other relief the court deems appropriate.

**AFFIRMATIVE DEFENSES**

**AFFIRMATIVE DEFENSE 1**

1. Plaintiffs have had multiple opportunities to sell the shares at issue in this matter.

2. Plaintiffs have not taken the opportunity to sell their shares.

3. Plaintiffs have therefore failed to mitigate their damages.

**AFFIRMATIVE DEFENSE 2**

1. Plaintiffs altered and modified the underlying terms of the Stock Purchase Agreement.

2. Among other added terms, Plaintiffs demanded additional financial contribution from Armada Group, GP, Inc. in order to sell the shares.

3. By modifying the terms of the Purchase Agreement, Plaintiffs effectively invalidated the Purchase Agreement.

4. Defendant Armada Group, GP, Inc. never agreed to the modified terms.

5. Plaintiffs therefore cannot establish the existence of a valid, enforceable contract.

**AFFIRMATIVE DEFENSE 3**

1. Plaintiffs altered and modified the underlying terms of the Stock Purchase Agreement.

2. Among other added terms, Plaintiffs demanded additional financial contribution from Armada Group, GP, Inc. in order to sell the shares.

3. Defendant Armada Group, GP, Inc. never agreed to the modified terms.

4. By attempting to add to and modify the terms of the Stock Purchase Agreement, Plaintiffs failed to perform on their responsibilities under the Agreement.

**AFFIRMATIVE DEFENSE 4**

1. Plaintiffs must prove damages as part of their claims.

2. Plaintiffs cannot prove how any alleged breach by Defendants of the Agreement caused the alleged damages stated in Plaintiffs' Second Amended Complaint.

3. Additionally, there were intervening causes such as the business decisions made by Premier and Plaintiffs that directly caused any alleged loss of value in the shares.

4. Plaintiffs therefore cannot establish all of the elements of their claims.


                                                                                   By:\_\_/s/ Rishi Agrawal_____
                                                                                         Rishi Agrawal
                                                                                       Attorney for Defendants

Rishi Agrawal
The Agrawal Firm, LLC
415 North LaSalle Street, #502
Chicago, IL  60654
(312) 527-5440

## CERTIFICATE OF SERVICE

I, RISHI AGRAWAL, an attorney certify that on May 2, 2016, that I caused to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, the above Answer to Plaintiffs' Second Amended Complaint, using the CM/ECF system, which shall send notice of this filing to all counsel of record.

By:_/s/ Rishi Agrawal_____
Attorney for Defendants