IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SELLERS CAPITAL, LLC, and<br>SELLERS CAPITAL MASTER<br>FUND, LTD. | )<br>)<br>)<br>) | Case No. 15-cv-07644 |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | Hon. Jorge L. Alonso |
| GEORGE WIGHT, ARMADA<br>GROUP, GP, INC. and ARMADA<br>ENTERPRISES, INC. | )<br>)<br>) | Mag. Judge Jeffrey T. Gilbert |
| Defendants. | )<br>) | |

## PLAINTIFFS' TRIAL BRIEF

Plaintiffs' presentation at trial will focus on two primary issues: (1) Whether Defendants Armada Group, GP, Inc.'s ("Group") and Armada Enterprises, Inc.'s ("Enterprises") corporate veils should be pierced so that Defendant George Wight ("Wight") is held personally liable for Group's breach of its Share Purchase Agreement ("Agreement") with Plaintiffs; and (2) the proper measure of damages for that breach, or, alternatively, for tortious interference. As will be shown more fully at trial, Group and Enterprises were shams that Wight used improperly to deceive Sellers Capital. Most significantly, Wight caused Group to represent to Plaintiffs in the Agreement that Group had $16,201,688 in "immediately available funds" and "sufficient cash on hand" to consummate the purchase of Premier Exhibitions, Inc. ("Premier") stock contemplated by the Agreement. Group, however, unbeknownst to Plaintiffs, never had any assets at all. And in a further demonstration of Wight's deceit, rather than trying in good faith to live up to his

obligations under the Agreement, Wight later made no meaningful effort to raise the funds necessary to close the deal.

At trial, Plaintiffs will ask for a damages award of $14,998,134, plus interest and costs, representing the difference between the share price Group agreed to pay and the price at which Sellers Capital distributed its shares of Premier stock following Group's breach. As shown below, this is the proper measure of damages under Illinois' UCC Article 2, which governs here. It is also the proper measure of damages for tortious interference. If the Court declines to pierce Group's corporate veil, thereby holding that it and Wight were distinct, then Wight (and Enterprises) tortiously interfered with the Agreement by failing to fund Group and by preventing Group from closing the deal.

Defendants have raised the affirmative defense that Plaintiffs failed to mitigate their damages. Nothing could be further from the truth. Sellers Capital members Mark Sellers and Sam Weiser moved quickly following Group's breach to find another buyer for their Premier stock. A buyer ended up merging into Premier in a deal that closed on November 1, 2015. Sellers Capital then distributed its Premier shares to its investors.

## SIGNIFICANT FACTS

**I.      Wight used Group, a sham corporation, to deceive Plaintiffs.**

Defendant Wight first contacted Sam Weiser, a member of Sellers Capital, in early 2014. *See* Plaintiffs' Proposed Findings of Fact and Proposed Conclusions of

Law (Dkt. 90-1) Fact ¶ 16.[1] From that first contact through October 15, 2014, the date of the Agreement, Wight engaged in a calculated and extensive campaign to deceive Plaintiffs into believing that Group and Enterprises were legitimate businesses with more than sufficient cash and assets on hand to close on the $16,201,688 purchase of Plaintiffs' Premier stock.

On January 19, 2014, Wight sent Weiser a letter of intent proposing that Armada[2] acquire Premier. Dkt. 90-1 Fact ¶ 16. In this letter of intent, Wight valued Armada at $665,000,000 and Group by itself at $165,000,000. In fact, Group had no value as of this date, and was not even incorporated until two days later. *Id*. ¶¶ 16-17. Weiser passed Wight's offer on to Premier's board, which sought additional information from Wight. *Id*. ¶ 20. Wight next gave Weiser (and Premier) a PowerPoint presentation that reported Armada had "over $7.2 billion in sales in 2013" and that Armada had experienced management and a Board of Advisors. *Id*. Armada had no sales in 2013, no experienced management, and no Board of Advisors. *Id*. ¶¶ 21-22.

On April 5, 2014, Wight sent Weiser a long email that portrayed Armada as an existing, thriving business. Id. ¶¶ 23-28. This email contained multiple false and misleading statements:

- A statement that Armada "was starting with $50 million in cash and $100

---

[1] Citations to Plaintiffs' Proposed Findings of Fact and Proposed Conclusions of Law are "Fact ¶ __" for Proposed Findings of Fact and "Law ¶ __" for Proposed Conclusions of Law.

[2] There are several corporations, LLC's, partnerships, and possibly other entities formed and controlled by Wight in which he used "Armada" in the name in various iterations and combinations. Unless a specific such entity is defined separately – such as Defendants "Group" and "Enterprises" – these are referred to collectively herein as "Armada."

3

million senior debt, line of credit." Group had no cash, no senior debt line of credit, and never opened so much as a checking account. No Armada entity ever put any cash into any deal involving Premier.

- A representation that "we paid" $5 million for a 10% stake in a company called Triton Submarines. Neither Wight nor any of his companies ever purchased any stake in Triton Submarines.

- A representation that Armada had made a "20 m[illion]" investment in Blue Water Ventures, Inc. ("BWVI"), which never happened.

- A statement that "We have one boat that was $26 million," when in fact Wight did not own such a boat.

- A general statement that Armada's "investment model" includes investing "up to 10% of the estimated recovery" on shipwreck salvage sites. Armada had not, and has never, invested in any shipwreck salvage sites.

*Id*. Three days later, Wight sent Weiser an Armada balance sheet showing $46,250,000 in "cash and equivalents," which Armada did not have. *Id*. ¶¶ 29-30.

In May 2014, Wight told Weiser about a $300 million capital contribution to Armada, writing that: "We have generated $300 million for purposes of our oil and gas enterprise" that was "in closing mode." *Id*. ¶¶ 32-33. In September 2014, Weiser confirmed in writing his understanding that Armada had access to the proceeds of that deal as either cash or collateral. JX 41. Weiser had been deceived; this transaction had not closed by September 2014 and, in fact, never closed. Dkt. 90-1 Fact ¶ 33.

## II. The Agreement and Group's breach.

On October 15, 2014, Group and Plaintiffs executed the Agreement, by which Group agreed to purchase Plaintiffs' shares of Premier stock for $16,288,601. *Id*. ¶ 40. The Agreement required that the closing occur no later than November 20,

4

2014, and prescribed three conditions precedent, all of which were met.[3] *Id.* ¶¶ 49, 68-77. In the Agreement, Group represented that it would pay in "immediately available funds" and had "sufficient cash on hand" to consummate the transaction. *Id.* ¶¶ 48, 52. These representations were false; Group was a sham corporation that had no cash, bank accounts, capitalization, financing, employees, office space, by-laws, or Board of Directors. *Id.* ¶¶ 95-121. Wight was Group's "founder" and sole owner, and Group never issued any stock. *Id.* ¶¶ 97-98, 104.

On November 19, 2014, Wight advised Plaintiffs that the Agreement would not close by November 20, 2014. *Id.* ¶ 60. Group failed to close or to pay the $16,201,688 purchase price to Plaintiffs by that date, thereby breaching the Agreement. *Id.* ¶ 66.

### III. Even after entering the Agreement, Wight never seriously tried to fund Group.

Despite knowing that he had misrepresented to Plaintiffs that there was "sufficient cash on hand" to close the purchase of the Premier stock, Wight made no meaningful effort after entering the Agreement to raise the funds necessary to close the deal. He had a few conversations with some banks and lenders, but their documents show that he refused to provide them even the most basic financial disclosures about himself or any of his businesses, standard prerequisites for obtaining a loan. JX 25, 27, 42; PX 5. On the day he signed the Agreement, he sent an abbreviated email to City National Bank ("CNB") in which he sought a meeting

---

[3] *See* Plaintiffs' Motion in *Limine* No. 2, Dkt. 91, and Reply in Support, Dkt. 97.

relating to a "[s]ecured stock loan of $20 million," without a word of explanation or justification. JX 54. Later, just before the closing date, he sent another email to CNB in a superficial effort to obtain a loan. JX 71 ("We require $20 million to close").[4] By the time Wight was done with CNB, its bankers called his conversations with them "comical." Deposition of Scott Walker at 63:11-15. Wight never told Plaintiffs about these half-hearted efforts to fund Group's obligations under the Agreement, or that he had been unsuccessful.

Wight's testimony is that he believed he might have been able to obtain the purchase money from his father, then a wealthy retiree. Deposition of George Wight ("Wight Dep.") at 286:3-8; 292:22-294:20. It is not clear whether this belief was well-founded (Wight's father is now deceased), but Wight testified he had no memory of asking his father to fund Wight's deal with Sellers Capital. *Id*. at 291:11-292:12.

## IV. After Group breached the Agreement, Plaintiffs made reasonable efforts to mitigate their damages.

Promptly following Group's breach of the Agreement, Mark Sellers and Weiser sought another buyer for Plaintiffs' block of Premier stock, or as an alternative, a buyer for Premier as a whole through a merger or other transaction. Dkt. 90-1 Fact ¶ 165. This effort was underway by December 2014, when Weiser met with Dinoking, a potential buyer for Premier. *Id*. ¶ 166. Sellers and Weiser contacted additional potential buyers as well, and both Dinoking and Premier ultimately retained outside legal counsel to negotiate a deal. *Id*. ¶¶ 169-170.

---

[4] The day after Wight sent this email, Group's lawyer Milan Saha told Plaintiffs that "We are showing up with the money." JX 74.

Those negotiations continued, primarily through counsel, throughout February and March of 2015. *Id.* ¶ 170. On April 2, 2015, Premier agreed to merge with Dinoking. *Id.* ¶ 176. The merger required Premier shareholder approval, which was given on October 29, 2015. *Id.* ¶ 177-178. On November 1, 2015, Premier's merger with Dinoking closed. *Id.* ¶ 179.

From April 2, 2015, to November 1, 2015, due to an agreement executed concurrent with the agreement to merge Premier and Dinoking, Plaintiffs were not permitted to sell or transfer their shares of Premier stock. *Id.* ¶ 180. After the merger closed, Premier was the surviving entity, and Plaintiffs once again sought another buyer for the stock. *Id.* ¶¶ 181-182. These discussions were unsuccessful. *Id..* On December 18, 2015, Sellers Capital distributed its Premier stock to its investors and stakeholders at a price per share of $0.78, the publicly-traded share price on that date. *Id.* ¶ 183.

## SIGNIFICANT LEGAL ARGUMENTS

### I. The Corporate Veil Should be Pierced and Wight Held Personally Liable For Breach of the Agreement.

Federal courts in diversity cases apply the substantive law of the state in which the District Court sits, including choice of law rules. *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012). "Illinois applies the law of the state of incorporation for veil piercing claims." *Id.* Florida is the state of incorporation for both Group and Enterprises. The corporate veil is pierced under Florida law when (1) a corporation is the mere instrumentality or alter ego of another; and (2) there is a showing of improper conduct. *Dania Jai-Alai Palace, Inc.*

7

*v. Sykes*, 450 So. 2d 1114, 1117, 1121 (Fla. 1984).

A corporation is the mere instrumentality or alter ego of another under Florida law when that other person "dominated and controlled the corporation to such an extent that the corporation's independent existence was in fact non-existent." *Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987, 990 (Fla. Ct. App. 1998).[5] Neither Group nor Enterprises had an existence independent of Wight. *See* Dkt. 90-1, Fact ¶¶ 96-116, 124-145. There can be no legitimate dispute that Group and Enterprises are each the mere instrumentality or alter ego of Wight.

Group in particular, as the insulating entity Wight chose to actually enter the Agreement, had no function other than to shield Wight from liability to the Plaintiffs. When asked to separately describe his work for Group, Enterprises, and Armada, Wight answered: "The best way to characterize that [,] is the work is overlapping. I frequently reference it as a Rubik's Cube constantly turning the pieces until you get the solution. To break it down by individual entity would be very hard to do." Wight Dep. 12:22-13:12. When Wight decided to purchase the Premier stock he simply twisted his Rubik's Cube, Group popped up as the

---

[5] In assessing whether a corporation is a mere instrumentality or alter ego of another, Florida courts consider, among other things, whether the corporation (1) observed corporate formalities, (2) operated in a bona fide fashion, (3) issued stock, (4) was adequately capitalized, (5) owned meaningful assets, (6) opened a bank account or had funds of its own, (7) had any employees, (8) earned any income, (9) intermingled assets and property, (10) shared offices and contact information, and (11) shared common or overlapping officers and directors. *See USP Real Estate Inv. Tr. v. Disc. Auto Parts, Inc.*, 570 So. 2d 386, 392 (Fla. Ct. App. 1990); *LIG Ins. Co. Ltd. v. Inter-Florida Container Transp., Inc.*, No. 12-20990-CIV-MORE, 2013 U.S. Dist. LEXIS 120176, at *17-18 (S.D. Fla. Aug. 23, 2013) (piercing the corporate veil of both the subsidiary and the parent to hold principals personally liable). These factors all militate in favor of piercing the corporate veil here and holding Wight personally liable for breach of the Agreement.

"solution" and Wight entered the Agreement using Group as the named contracting entity. As described above, Wight's representation in the Agreement that Group had "sufficient cash on hand" was false, and he later made no serious effort to fund Group to remedy his misrepresentation. At most, he had "comical" preliminary conversations with bankers and may have talked to his father.

Turning to the second element for piercing the corporate veil under Florida law, Wight engaged in multiple layers of "improper conduct."[6] First and most simply, Wight used Group to enter the Agreement when Group was without the present ability or expectation to perform. Pursuant to Article 1.1 of the Agreement, Group promised to pay Plaintiffs $16,201,688 "in immediately available funds," and Wight and Group confirmed in Article 4.4 that Group "has sufficient cash on hand" to consummate the stock purchase. JX 51. Group, however, never had the $16,201,688 cash on hand, and, in fact, never had any cash on hand. *See* Dkt. 90-1 Fact ¶¶ 95-121; *see also* JX 135, 138, 148, 151; Wight Dep. at 305:7-306:7.[7]

Wight also engaged in "improper conduct" by using the corporate form to

---

[6] "Improper conduct" is the misuse of the corporate form for an illegal or improper purpose, including, but not limited to, (1) misleading creditors, (2) perpetrating fraud, (3) evading liability for a transaction that was personal and not corporate, and (4) entering a contract when the corporation is insolvent or without the present ability or expectation to perform. *Dania*, 450 So. 2d at 1119-21; *USP Real Estate Inv. Trust* 570 So. 2d at 390-92.

[7] Wight also misused the corporate form of Enterprises. On November 19, 2014, Wight sent a letter *on Enterprises letterhead* to inform Weiser the Agreement would not close on November 20, 2014, as required, but also advised, without any reference to Group, that "we intend to proceed with the deal." JX 80 (emphasis added). To the extent Wight's "we" included Enterprises, it, like Group, never had the $16,201,688 to consummate the Agreement, and, in fact, had little, if any, cash on hand. JX 52, 135, 138, 148, 125; Wight Dep. at 305:7-306:7.

9

evade liability when the Agreement was, in truth, a personal obligation of Wight. Under Florida law the corporate veil can be pierced when the corporation "simply had no business purpose other than to act as an insulating entity between" the dominant person and the other contracting parties. *USP Real Estate Inv. Trust*, 570 So. 2d at 392. Group "simply had no business purpose" other than entering the Agreement as Wight's Rubik's Cube "solution" to which Wight-controlled entity he would use to shield himself from personal liability.

Wight signed the Agreement purportedly as Managing General Partner of Group. Wight, however, was not the Managing General Partner of Group. In fact, Group has never had a Managing General Partner. *See* Wight Dep. 30:13-31:5. And even though in Article 4.2 of the Agreement, Group represented and warranted to Plaintiffs that it "[had] been duly authorized by all necessary action," no corporate resolution had, in fact, been adopted by Group vesting it with the authority to enter the Agreement. Given that Wight was not the Managing General Partner of Group, that Group never even had a Managing General Partner, and that Group was not authorized to enter the Agreement, Wight should be deemed to have signed his name to the Agreement in his personal and individual capacity.[8]

Finally, as described in detail above, Wight also misused the corporate form to mislead Plaintiffs as parties to and creditors under the Agreement. Wight deceived

---

8   Because Wight signed the letter dated November 19, 2014, on Enterprises letterhead with no indication that he was doing so in a representative capacity, Wight should also be deemed to have confirmed that "we intend to proceed with the deal" in his personal and individual capacity. JX 80.

Plaintiffs by making it appear that Group and Enterprises were established businesses with successful operating histories and substantial assets, including significant liquid assets in the form of cash and equivalents. Dkt. 90-1, Fact ¶¶16-18, 20-30, 32-37; JX 2, 9, 10, 11, 15, 33, 34.

Defendants appear to base their entire defense to Plaintiffs' veil piercing claims on *On Command Video Corp. v. Roti*, 705 F.3d 267 (7th Cir. 2013). As stated in Plaintiffs' Reply Memorandum in Support of Their Motion in *Limine* No. 3, Dkt. 98, that case is factually inapposite. Most significantly, here, Group represented *in the Agreement itself*, that it had "sufficient cash on hand" to close the contemplated transaction, a dispositive fact missing from *On Command Video. See On Command Video* at 275 ("It's not as if [defendant] made representations or insinuations concerning its solvency that might have dispelled any concerns that [plaintiff] might have"). Further, Florida law differs markedly from Illinois' in that under Florida law, a plaintiff need not make "inquiry as to the financial condition" of the sham corporate signatory, but may instead "rely on the terms" of the contract at issue. *See* Dkt. 98 at 9.

## II. Plaintiffs' damages are properly measured at $14,998,134.

Damages in a breach of contract case should "place the injured party in the position they would have been in had the contract been fully performed." *O'Connor Constr. Co. v. Belmont Harbor Home Dev., LLC*, 391 Ill. App. 3d 533, 539, 909 N.E.2d 294, 298 (1st Dist. 2009) (citing *Restatement (Second) of Contracts* § 347). "Illinois, like other states, applies expectation damages to breach-of-contract

11

actions." *West Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 794 F.3d 666, 679 (7th Cir. 2015) (citing *Santorini Cab Corp. v. Banco Popular N. Am.*, 2013 IL App (1st) 122070, ¶ 26-27; *see also* 810 ILCS 5/2-708(2) (goal is "to put the seller in as good a position as performance would have done").

Uniform Commercial Code ("UCC") Article 8 applies generally to investment securities, but does not address the proper measure of damages for breach of a contract to purchase investment securities. Illinois courts apply UCC Article 2 to quantify damages in such cases. *See Am. Nat'l Bank & Trust Co. v. Weyerhaeuser Co.*, 692 F.2d 455, 467 (7th Cir. 1982) ("for rules applicable to a case where damages is the proper remedy because the securities tendered have been rejected, returned, and resold, we must look to [UCC Section 2-706] (pertaining to the sale of goods)").

### A. UCC Section 2-706 best measures Plaintiffs' damages.

Article 2 presents a seller with different options for recovery following a buyer's breach. 810 ILCS 5/2-703; 810 ILCS 5/2-706; *R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 826 F.2d 678, 681-82 (7th Cir. 1987). Section 2-706 permits plaintiffs to recover the difference between the contract price and the price recovered in a later sale, so long as "the resale is made in good faith and in a commercially reasonable manner." 810 ILCS 5/2-706.[9] This is the measure of damages Plaintiffs seek.

On December 18, 2015, Plaintiffs distributed their Premier stock to their

---

[9] To the extent that 810 ILCS 5/2-706(3) required Sellers Capital to have given notice to Group of its intention to resell, Sellers Capital did so immediately following Group's breach. *See* JX 87 ("Sellers reserve any and all rights to . . . remarket the Shares").

investors and credited them with the publicly-traded (NASDAQ) value on that date ($0.78), the functional equivalent of a sale. Dkt. 90-1 Fact ¶ 91. Because Sellers Capital reasonably resold its Premier shares in good faith and in a commercially reasonable manner, it respectfully requests damages of $14,998,134, an amount equal to the difference between the contract price and the resale price.[10]

### B. Plaintiffs made commercially reasonable efforts to mitigate their damages and resell the shares.

A plaintiff seller should "use all *reasonable* means to minimize his damages." *Santorini*, 2013 IL App (1st) 122070, ¶ 28 (emphasis added). This rule is echoed in Section 2-706's statement that the resale of goods should be made in a "commercially reasonable manner." 810 ILCS 5/2-706(1). The UCC focuses on the aggrieved seller's reasonable efforts, not the duration of time between the breach and the resale. *See Am. Nat'l Bank & Trust Co.*, 692 F.2d at 469 (there is "no clearcut [*sic*] or easily identifiable rule as to what constitutes a commercially reasonable time" for resale). Defendants have indicated they will dispute whether Plaintiffs took reasonable steps to mitigate their damages. *See* Dkt. 90-2 ¶¶ 41-42. As detailed above, Plaintiffs' efforts to resell their Premier stock were more than reasonable. *See* Section I.IV, *supra*; *see also* Dkt. 90-1 Law ¶¶ 30-34.

---

[10] In February 2015, Premier's stock underwent a reverse 1-for-10 split. Dkt. 90-1 Fact ¶ 91. Following this split, Group's contract obligation was accurately expressed as an obligation to purchase 1,543,018 shares of Premier stock (1/10 of the amount of shares listed in the Agreement) at $10.50/share (10x the Agreement's stated share price) for the same Purchase Price of $16,201,688. Thus, Sellers Capital's December 2015 distribution at $0.78/share mitigated its damages by that amount per share, leaving damages of $9.72/share. $9.72 * 1,543,018 = $14,998,134.

**C. Defendants' proposed alternative measure of damages is baseless.**

Defendants have argued, without evidence, that Plaintiffs failed to capitalize on additional opportunities to sell their Premier shares. Dkt. 90-2 ¶ 41. To the extent Defendants argue Plaintiffs could have or should have sold their shares publicly, such a sale would have been commercially unreasonable, if not impossible. Sellers Capital's members were affiliates of Premier and barred from publicly selling Plaintiffs' block of shares. *See* Dkt. 90-1 Law ¶ 33. Further, a public sale would have required notice to the SEC, which almost certainly would have depressed the stock price and made a public sale commercially unreasonable. *Id.*

Defendants also argue that Plaintiffs' damages should be limited to the difference between the Agreement's sale price and the publicly-traded stock price of Plaintiffs' Premier shares on the date of the breach. Dkt. 90-2 ¶ 43. But that price did not account for a control premium or the Premier board seats that Group was gaining, and thus is an inaccurate and unfair baseline against which damages for breach of the Agreement might be measured. *See, e.g., Kovens v. Paul*, No. 04 Civ. 2238 (TPG), 2009 U.S. Dist. LEXIS 19378, at *16-17 (S.D.N.Y. Mar. 4, 2009) (market price is "an unsatisfactory indicator of the value of the stock" which consisted of "a large block of shares that would have been difficult to acquire on the open market" and because "the market price does not account for the premium that [buyer] placed on the share because they would enable him to take control of the company"). The price Plaintiffs were later able to obtain provides the better baseline because damages equal to the difference between that price and the Agreement

14

price would put Plaintiffs "in as good a position as performance would have done." 810 ILCS 5/2-708(2).

### D. Plaintiffs' tortious interference damages are also $14,998,134.

Plaintiffs' tortious interference claim is pled as an alternative to its veil piercing claim. If the Court finds that Group's and Enterprises' corporate veils should not be pierced, then Wight and Enterprises were separate legal entities from Group that tortiously interfered with the Agreement by (1) failing to fund Group's purchase of Plaintiffs' Premier stock; and (2) preventing the closing, including by sending the November 19, 2014 letter on Enterprises letterhead. Dkt. 90-1 Fact ¶ 87.

This tortious interference caused Plaintiffs damages in the amount of at least $14,998,134, because Wight's and Enterprises' interference prevented Group from closing its deal with Plaintiffs. *See Koehler v. Packer Grp., Inc.*, 2016 IL App (1st) 142767, ¶ 64 (damages for tortious interference with contract include the "pecuniary loss of the benefits of the contract"). Plaintiffs were later able to distribute their Premier stock at a value of $0.78/share following a 1-for-10 split, leaving them with damages of $9.72/share, for a total loss of $14,998,134. *See* Footnote 10, *supra*.

## CONCLUSION

Following the parties' presentations at trial, Plaintiffs respectfully request that final judgment be entered against Defendants, including George Wight individually, for money damages in the amount of $14,998,134 plus prejudgment interest and costs, and any other necessary, just, or proper relief.

|  | Respectfully Submitted, |
|---|---|
|  | **SELLERS CAPITAL, LLC, AND SELLERS CAPITAL MASTER FUND, LTD.** |
| Dated: July 13, 2017 | By: <u>/s/ Adam N. Hirsch</u><br>One of Their Attorneys |

Adam N. Hirsch (Ill. No. 6275127)
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100 – Telephone
(312) 663-0303 – Fax
ahirsch@robinsoncurley.com

## **CERTIFICATE OF SERVICE**

    I, Adam N. Hirsch, an attorney, certify that on July 13, 2017, I caused to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, the foregoing, using the CM/ECF system, which shall send notice of this filing to all counsel of record.

                                          /s/ Adam N. Hirsch
                                          One of Plaintiffs' Attorneys